## UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| United Guaranty Residential Insurance Company of North Carolina,<br><br>              Plaintiff,<br><br>        -against-<br><br>Countrywide Financial Corp., and Countrywide Home Loans, Inc.<br><br>           Defendants. | Civil Action No. 09-203<br><br>**COMPLAINT** |

Plaintiff United Guaranty Residential Insurance Company of North Carolina ("United Guaranty"), by its attorneys, Quinn Emanuel Urquhart Oliver & Hedges LLP, for its Complaint herein against Countrywide Financial Corporation ("Countrywide Financial") and Countrywide Home Loans, Inc. ("Countrywide Home Loans") (collectively, "Countrywide"), alleges as follows:

### NATURE OF ACTION

1.      This action arises out of the fraudulent misrepresentations and other misconduct of Countrywide Financial and Countrywide Home Loans, through which they induced United Guaranty to insure billions of dollars of mortgage loans generated by these two entities and their network of brokers and correspondents.

2.      United Guaranty Corporation and its subsidiaries provide mortgage insurance, which covers mortgage lenders in the case a borrower defaults on a loan.

United Guaranty is a leader in the industry and since 1963 has sold mortgage insurance to a wide variety of clients. In particular, United Guaranty Corporation, the parent of United Guaranty, has sold mortgage insurance to Countrywide for almost forty years. United Guaranty Corporation has traditionally insured mostly fixed-rate residential mortgages with 30-year and 15-year terms.

3. In 2005 and 2006, Countrywide, the largest residential mortgage originator in the country at that time, orchestrated the issuance of billions of dollars of residential mortgage-backed securities that it dubbed Countrywide Home Equity Loans ("CWHEQ"). In order to form these securities, Countrywide originated and sold (or otherwise conveyed) thousands of second-lien mortgage loans, also known as home equity lines of credit or closed end second mortgages, to trusts. The trustees in turn issued and sold shares of these CWHEQ securitizations to investors in the secondary market. As part of its contracts with the trustees conveying the mortgage loans and structuring the CWHEQ, Countrywide agreed to obtain insurance from United Guaranty to cover the mortgage loans.

4. Unlike the traditional use of mortgage insurance – to facilitate home purchases by responsible borrowers – Countrywide wanted coverage in order to increase the credit rating of the CWHEQ securitizations and thus make them more marketable to investors. Countrywide made multiple representations and traded on its long-standing relationship with United Guaranty to induce United Guaranty to insure the mortgage loans. At issue here are nine insurance policies covering loans underlying nine CWHEQ

securitizations (collectively, the "Insurance Policies"). The trustees for the CWHEQ transactions, Bank of New York Mellon Trust of Delaware and Wells Fargo Bank, NA (collectively, "Trustees"), are the insureds under these policies.[1]

5.     In order to procure insurance coverage for the mortgage loans underlying the CWHEQ securitizations (collectively, the "Mortgage Loans"), Countrywide falsely represented to United Guaranty that it had originated the Mortgage Loans in strict compliance with Countrywide's underwriting standards and guidelines, which were developed over time to screen the creditworthiness of borrowers and increase the likelihood that Mortgage Loans would be repaid. As Countrywide well knew, United Guaranty relied on these underwriting standards and guidelines to evaluate the risk it would incur by insuring the Mortgage Loans. United Guaranty priced and issued a total of nine Insurance Policies to cover the Mortgage Loans underlying each of the nine CWHEQ securitizations, based on the representations Countrywide made concerning the quality of the Mortgage Loans and their adherence to both Countrywide's own underwriting standards and guidelines, as well as industry standards of reasonable and prudent underwriting. Since these were second-lien mortgage loans, strict adherence to underwriting standards and guidelines was essential to control the risk inherent in second-lien lending.

---

[1]   Chase Bank was initially the trustee for seven of the CWHEQ transactions, but its obligations as trustee passed to The Bank of New York, which subsequently merged with the Mellon Financial Corporation to form The Bank of New York Mellon Corporation. United Guaranty is pursuing its rights against the Trustees in a parallel arbitration filed with the AAA concurrently with this Complaint.

6.     In reality, Countrywide had abandoned any reasonable and prudent underwriting standard in order to secure as large a piece of the mortgage boom as possible. Under the direction of former Chief Executive Officer Angelo Mozilo and former President and Chief Operating Officer David Sambol, Countrywide systematically disregarded its own underwriting standards and guidelines in order to generate an unprecedented volume of loans. Countrywide intentionally extended billions of dollars in loans to borrowers who could not afford to repay loans, who committed fraud in loan applications – often with the assistance and encouragement of Countrywide employees and brokers – or who otherwise did not satisfy the basic risk criteria for prudent and responsible lending that Countrywide claimed to use. Countrywide also fraudulently concealed its abusive conduct by making multiple representations, both publicly and specifically to United Guaranty, that it adhered to high standards of care in its underwriting and employed multiple safeguards against fraud.

7.     Countrywide's failure to abide by any standard of care in its loan origination practice dramatically changed the risk profile of the covered Mortgage Loans, and as a direct result, thousands of insured loans are in default or foreclosure. Due to the high number of defaults, United Guaranty undertook a review of the Mortgage Loans and obtained from Countrywide the original loan files for a sample of the loans. To date, United Guaranty's review has found that a significant proportion of the Mortgage Loans were either underwritten in violation of Countrywide's standards and guidelines, or contain some other material defect.

8.      In order to initiate obtaining coverage for the Mortgage Loans underlying each CWHEQ, prior to their formation Countrywide would send United Guaranty a loan tape, which contained information about the loans that were to be included in the loan pool.   United Guaranty's review showed that, in addition to misrepresenting that the loans complied with its underwriting guidelines, Countrywide also misrepresented the Mortgage Loans in these tapes:

a.   Countrywide misrepresented borrowers' incomes and debts.  The debt-to-income ratio for a borrower is one of the most important measures of that borrower's ability to repay a loan.

b.   Countrywide's property appraisals materially overstated the value of the collateral underlying the loans.  Because the property is the only security pledged for repayment of a loan should the borrower default, such overstatements fundamentally alter the risk of insuring that loan.

c.   Countrywide misrepresented the lien position on properties.  As a result, properties were encumbered by additional undisclosed mortgages.

9.      As a result of the unprecedented number of defaults in the Mortgage Loans, United Guaranty has already paid out insurance claims totaling hundreds of millions of dollars, and it is exposed to additional claims of several hundred million dollars more.  If Countrywide had truthfully represented the Mortgage Loans, United Guaranty would not have insured them at the same rate of premium.  Instead, it would have issued different

insurance policies at different rates of premium, or refused to insure the loans at all.
Either way, United Guaranty would not be exposed to the huge losses it faces today.

10.     Former Countrywide insiders have admitted to Countrywide's reckless and
abusive course of conduct.  A former senior level vice president at Countrywide has said,
according to a securities class action filed against Countrywide, that "so long as we could
sell it, we'd do it."  Brian Koss, a former senior regional vice president, told Business
Week:

> [Countrywide] approached making loans like making widgets, focusing on
> cost to produce and not risk or compliance.  Programs like 'Fast and Easy'
> where the income and assets were stated, not verified, were open to abuse
> and misuse. The fiduciary responsibility of making sure whether the loan
> should truly be done was not as important as getting the deal done.

11.     United Guaranty is not the only victim of Countrywide's fraud.  Dozens of
lawsuits have been filed against Countrywide entities by cities, states, shareholders,
former employees, appraisers, and insurers.  Many of the complaints filed allege fraud in
Countrywide's underwriting processes that are nearly identical to those abuses alleged in
the instant demand.  Countrywide recently announced the settlement of multiple actions
brought by the Attorneys General of eleven different states.  Instead of contesting these
claims, Countrywide agreed to provide $8.4 billion to reduce payments on thousands of
alleged predatory mortgage loans.

12.     In short, Countrywide abandoned its own underwriting standards and
guidelines to boost its market share and then misrepresented the quality of its loans so
that United Guaranty would provide insurance coverage for them.  Since United

Guaranty issued the Insurance Policies based on the representations of Countrywide and would not have issued the Insurance Policies on the same terms – or at all – had it known that many of these representations were false, United Guaranty is entitled to damages.

## THE PARTIES

13.     Plaintiff United Guaranty is a North Carolina corporation with its principal place of business in Greensboro, North Carolina.

14.     Defendant Countrywide Financial Corporation is a Delaware corporation with its principal executive offices in Calabasas, California.  Countrywide Financial, itself or through its subsidiaries, is engaged in mortgage lending and other real estate finance related businesses, including mortgage banking, securities dealing, and insurance underwriting.  On July 1, 2008, Countrywide Financial was acquired by Bank of America.

15.     Defendant Countrywide Home Loans, Inc., a wholly-owned subsidiary of Countrywide Financial Corporation, is a New York corporation with its principal executive offices in Calabasas, California.  Countrywide Home Loans originates and services residential home mortgage loans.

16.     On information and belief, Countrywide employees involved in the CWHEQ transactions held positions at both Countrywide Home Loans and Countrywide Financial and made representations to United Guaranty on behalf of both companies.  For example, Steven Radu of Countrywide was involved in the CWHEQ transactions and

often acted as United Guaranty's main contact at Countrywide for these transactions.  Mr. Radu had titles at both Countrywide Home Loans and Countrywide Financial.  In addition, his email correspondence did not always distinguish whether he was writing on behalf of Countrywide Home Loans or Countrywide Financial.

## JURISDICTION AND VENUE

17.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     This Court has personal jurisdiction over the defendants by virtue of their business activities within North Carolina.

19.     Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391, as substantial events giving rise to this Complaint took place in Greensboro, North Carolina.

## FACTUAL ALLEGATIONS

### I.     United Guaranty Has Long Followed A Practice Of Insuring Conservative Mortgages.

20.     United Guaranty has provided insurance to mortgage lenders since 1963. For over forty years, United Guaranty has been and continues to be a conservative insurer whose business focuses on generic, low-risk mortgages.  Throughout its history, United

Guaranty has insured mostly fixed-rate residential mortgages with 30-year and 15-year terms.

21.     Mortgage insurance is payable to the lender when a borrower defaults and the lender is not able to recover its costs.  When the borrower's property fails to adequately secure the loan, United Guaranty can be required to pay out an insurance claim.  United Guaranty is therefore directly exposed to decreases in value of the underlying property, which serves as collateral for the loan.  As United Guaranty covers the risk of borrower default, it shares many of the same risks as homeowners – such as fluctuations in the economy or property values – that can make it difficult for homeowners to pay their mortgages.

22.     Since the 1980s, United Guaranty has used a "delegated model" for underwriting.  Underwriting is the process whereby an insurer determines the risk associated with a loan and decides whether to offer insurance.  Under the delegated model, United Guaranty does not underwrite each loan itself.  Instead, it relies on the lender to accurately represent information on the loans to be insured.  For example, the lender may represent that the loans satisfy certain underwriting guidelines such as minimum credit scores or maximum loan-to-value ratios.  Based on the lender's representations, United Guaranty then decides whether to offer insurance.  This model is efficient, cost-effective, and preferred by many lenders.

23.     United Guaranty properly performs its due diligence for loans underwritten using the delegated model.  For example, United Guaranty reviews the information on

loans to be insured to determine that each loan conforms with the applicable underwriting guidelines.  In addition, United Guaranty performs random sampling to confirm loan quality.  However, United Guaranty's due diligence is primarily based on the lender's representations regarding the loans and on the lender's exercise of due care in properly underwriting the loans.

## II.     Countrywide Historically Originated Low Risk Loans and Represented Itself To Be a Responsible Lender.

24.     United Guaranty Corporation and its subsidiaries have done business with Countrywide entities for almost forty years.  Countrywide Financial Corporation, the parent of Countrywide Home Loans, was founded in 1969 and soon became a customer.

25.     Countrywide was formerly a leader in the residential mortgage lending industry.  Each year, it originated hundreds of billions of dollars in mortgage loans nationwide.  In 2006 and 2007, Countrywide generated approximately $880 billion in mortgage loans and serviced over a trillion dollars of mortgage loans.

26.     Throughout its relationship with United Guaranty, Countrywide extolled its conservative credit policy as well as the multiple safeguards it used to ensure the creditworthiness of borrowers and to prevent fraud.  Countrywide made similar representations to the public.  For instance, Countrywide claimed its policies were "designed to produce high quality loans through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews."  In its 2004 annual report, Countrywide summarized the comprehensive standards of its credit policy:

Our Credit Policy establishes standards for the determination of acceptable credit risks. . . . Our loan origination standards and procedures are designed to produce high quality loans. These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and ongoing review of their work . . . In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

27.     Countrywide claimed that its disciplined underwriting standards and guidelines made it an industry leader and a role model for other lenders. For example, at an investor forum hosted by Countrywide in September 2006, Mozilo explained that Countrywide led the industry in responsible lending:

Not only did we drive efficiency in the marketplace, but as an industry leader we served as a role model to others in terms of responsible lending. We take seriously the role of a responsible lender for all of our constituencies. . . . To help protect our bond holder customers, we engage in prudent underwriting guidelines.

28.     United Guaranty relied upon these and other representations by Countrywide in deciding to issue the Insurance Policies.

## III.     <u>Countrywide Dramatically Increases The Volume Of Its Loan Origination While Representing It Will Maintain The Same High Underwriting Standards.</u>

29.     In the early 2000's, the demand for mortgage-backed securities increased dramatically. In particular demand were second-lien mortgages.

30.     Countrywide sought to capitalize upon this increased demand by embarking on a radical campaign to increase the volume of loans it originated – loans that would then be securitized and sold on the secondary market. In a January 2004 call with

securities analysts, Mozilo announced that Countrywide, already the industry leader with a nearly 15% loan origination market share, planned to double its market share within four years: "Our goal is market dominance, and we are talking 30% origination market share by 2008."

31.     Mozilo pledged that Countrywide would maintain its commitment to loan quality by targeting only the safest borrowers in this market: "Going for 30% mortgage share here is totally unrelated to the quality of loans we go after . . . .  There will be no compromise in that as we grow market share.  Nor is there a necessity to do that."

32.     During a March 15, 2005 conference with analysts, Mozilo responded to a question about Countrywide's strategy for increasing market share:

> Your question is 30 percent, is that realistic, the 30 percent goal that we set for ourselves 2008? . . . Is it achievable?  Absolutely. . . . But I will say this to you, that under no circumstances will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30 percent market share.

33.     As part of this drive for increased market share, Countrywide expanded its origination and securitization of riskier lines of products, including subprime mortgages, stated income loans, interest-only loans, Pay Option ARMs (an adjustable rate mortgage loan that allows a borrower to make initial minimum monthly payments less than monthly accrued interest), closed-end second liens, and home equity lines of credit, with a much broader base of potential borrowers.

34.     While it expanded its business into riskier areas, Countrywide reassured investors and insurers, such as United Guaranty, that its underwriting procedures and

credit risk management remained rigorous. For example, in its 2005 10-K, Countrywide represented that:

> [Countrywide] ensure[s] . . . ongoing access to the secondary mortgage market by consistently producing quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards. . . . [W]e have a major focus on ensuring the quality of our mortgage loan production and we make significant investments in personnel and technology in this regard.

35.     In particular, Countrywide touted its underwriting guidelines, claiming that it took into consideration facts about loan applicants' sources and amounts of income, assets, debts, employment history, and personal information, as well as a full property appraisal. Countrywide claimed that it obtained all applicable income, liability, asset, employment, credit, and property information, on the basis of which it ascertained debt-to-income ratios (the ratio of a borrower's total monthly debt obligations to gross monthly income) and combined loan-to-value ratios (the ratio of the total outstanding value of the senior and subordinate loans on a property to the value of such property). Because Countrywide's underwriting guidelines are ostensibly designed to ensure that loans perform over time, Countrywide knew that the quality of its guidelines – and its adherence to them – would materially affect the risks of insuring the Mortgage Loans.

## IV.     **Countrywide Induces United Guaranty to Insure The Mortgage Loans Underlying Nine Securities Transactions.**

36.     United Guaranty created its second-lien mortgage loan department in 1972. Second-lien loans, also known as home equity lines of credit, are loans in which the

borrower uses the equity in their home as collateral. The second-lien department has done business with Countrywide since the early 1980's.

37.     Starting in 2005, coinciding with its efforts to rapidly capture more market share, Countrywide began aggressively expanding its second-lien business and sought increasing amounts in insurance coverage from United Guaranty. In 2006, United Guaranty insured approximately $8 billion in second-lien loans originated by Countrywide.

38.     In 2005 and 2006, Countrywide orchestrated the creation of nine securitizations encompassing over $14 billion of Mortgage Loans: CWHEQ 2005-F, CWHEQ 2006-S1, CWHEQ 2006-A, CWHEQ 2006-B, CWHEQ 2006-C, CWHEQ 2006-D, CWHEQ 2007-6, CWHEQ 2006-F, and CWHEQ 2006-H (collectively, the "Securitizations").

39.     Each Securitization was composed of a pool of second-lien loans, originated or acquired by Countrywide, that were conveyed to a trust. The trust then issued certificates to private investors that represented interests in the Mortgage Loans and entitled certificate owners to distributions of loan payments. Credit ratings were provided by Moody's and Standard & Poor's for each tranche of the Securitizations. Because the Mortgage Loans are the only collateral supporting the Securitizations, their credit quality is of critical importance to a certificate holder.

40.     Countrywide acted in several capacities on the Securitizations, in each of which it stood to profit. First, Countrywide Home Loans originated or acquired all the

Mortgage Loans for each Securitization and sold (or otherwise conveyed) the Mortgage Loans to the trusts that issued the certificates. Second, Countrywide Securities arranged each Securitization, structuring and marketing the transaction as well as making SEC filings. Third, Countrywide Home Loans Servicing LP acted as servicer for the Mortgage Loans in each Securitization, contracting with each of the trusts that it caused to be created to issue the CWHEQ certificates.

41. In 2005, Countrywide approached United Guaranty about insuring the Mortgage Loans underlying the Securitizations. United Guaranty's insurance would increase the marketability of the notes by allowing Countrywide to obtain a better credit rating for its securities, which in turn made the certificates appear to be a safer investment.

42. Countrywide proposed that United Guaranty issue mortgage insurance for a pool of second-lien mortgage loans generated by Countrywide, but held in trust by a bank acting as Trustee. Thus the insured would not be the loan originator, but the Trustee that held the loans for securitization. The coverage would increase the ratings given to the Securitizations by Moody's and Standard & Poor's, and thus make the investments appear less risky. Since Countrywide sold the securities and thereby transferred the risk of default to the investors, it was primarily concerned about the risk of default only as it affected marketability of the securities.

### A. Countrywide Makes Multiple Representations To Induce United Guaranty to Insure Its Mortgage Loans.

43.     United Guaranty relied on multiple representations by Countrywide when it insured the Mortgage Loans underlying the CWHEQ securitizations.  As described above, United Guaranty's insurance operates under a "delegated model," whereby United Guaranty issues insurance based on data provided by the lender.  In order to initiate obtaining coverage for the Mortgage Loans underlying each CWHEQ, prior to their formation Countrywide would send United Guaranty a loan tape, which contained information about the loans that were to be included in the loan pool.   While a loan tape was originally an actual tape, today the term refers to an electronic file, such as an Excel spreadsheet, containing information on a particular loan pool.  The loan tape reported information such as the loan-to-value ratio ("LTV") for each loan and the debt-to-income ("DTI") ratio for each borrower, as well as each borrower's FICO score, a standard measure of creditworthiness.

44.     United Guaranty would then examine the data on the loan tape, eliminate loans that failed to meet certain criteria, and price the insurance based on Countrywide's representations.

45.     If Countrywide accepted United Guaranty's price, then Countrywide and United Guaranty would execute a set of contracts to form each CWHEQ and issue the insurance policy.  These documents contained representations of both Countrywide and the Trustee upon which United Guaranty relied in agreeing to issue insurance to cover the Mortgage Loans.

46.     The relevant documents were:

        *(a)  The Trust Indenture*

47.     This agreement establishes the rights of the certificate holders of each

CWHEQ and the obligations of the Trustee.  United Guaranty is not a signatory.  Each

Indenture refers to the Insurance Policy specific to each CWHEQ as the "Loan Insurance

Policy" and refers to United Guaranty as the "Loan Insurance Policy Provider."

        *(b)  The Commitment Letter*

48.     The Commitment Letter for each CWHEQ is an agreement between United

Guaranty and Countrywide Home Loans under which United Guaranty agrees to issue an

insurance policy to the Trustee to cover certain loans that underlie the CWHEQ.  In each

Commitment Letter, Countrywide Home Loans makes specific representations

concerning the quality of the loans and standards used to underwrite each loan.  For

example, Countrywide Home Loans specifically represents in each letter that:  (i) the

loans were underwritten in accordance with Countrywide Home Loans' underwriting

guidelines; and (ii) the loans comply with certain terms and conditions of the associated

Insurance Policy.  The Commitment Letters were executed by Countrywide Home Loans

and United Guaranty.

        *(c)  The Policy*

49.     Pursuant to the Commitment Letter, which served as an application for

insurance, United Guaranty issued an Insurance Policy to the Trustee.  The terms of the

Insurance Policy state that in the event that Mortgage Loans in the pool go into default,

the Trustee or servicer submits a claim to United Guaranty. United Guaranty then evaluates the claim, and if the loan conforms with the terms of the policy, United Guaranty pays the loss.

50.     The Trustee expressly represents and warrants in each Policy that: (i) statements made by it, the borrower, or any other person in any application for coverage under the Policy are its own representations; (ii) United Guaranty issued the Policy in reliance on the correctness and completeness of these statements; (iii) all statements made and information provided to United Guaranty in an application are supported by statements in the associated loan file; (iv) all statements made and information provided to United Guaranty in an application are not false and misleading in any material respect, and do not omit any fact necessary to make them not false or misleading; and (v) the loans comply with the appropriate underwriting guidelines.

51.     Each CWHEQ included these documents, and each set of documents is substantially similar. The dates of each of the nine transactions are as follows:

| | |
|---|---|
| CWHEQ 2005-F | September 29, 2005 |
| CWHEQ 2006-S1 | March 1, 2006 |
| CWHEQ 2006-A | February 22, 2006 |
| CWHEQ 2006-B | March 22, 2006 |
| CWHEQ 2006-C | March 23, 2006 |
| CWHEQ 2006-D | March 23, 2006 |
| CWHEQ 2006-E | June 22, 2006 |

> CWHEQ 2006-F        June 23, 2006
>
> CWHEQ 2006-H        September 29, 2006

52.     Each CWHEQ closed in an abbreviated time frame.  For example, on March 6, 2006, Garrett Galati of Countrywide emailed United Guaranty loan tapes describing the preliminary population of CWHEQ 2006-C and 2006-D.  These deals closed on March 23, just a few weeks later.

53.     Countrywide set up the CWHEQ transactions in this manner so that United Guaranty and other insurers were obligated to rely on its representations as to the Mortgage Loans underlying the transaction.

*(d)  The Countrywide Technical Manuals*

54.     In addition to the documents specific to the individual Securitizations, United Guaranty also relied on Countrywide Home Loans' Technical Manuals. Countrywide provided these Technical Manuals, which set forth the underlying general guidelines that apply to all of Countrywide Home Loans' mortgage loans, to United Guaranty.  In the Technical Manuals, Countrywide made extensive representations and warranties, including that:

> It is Countrywide's policy to originate and purchase investment quality loans.  An investment quality loan is one that is made to a borrower from whom timely payment of the debt can be expected, is adequately secured by property, and is originated in accordance with Countrywide's Technical Manual and Loan Program Guides.

55.     Countrywide's Technical Manuals further provide that "[w]hen underwriting exception loans, the underwriter [Countrywide] must . . . [e]nsure that the

mortgage file contains documentation that supports the final underwriting decision and the Uniform Underwriting and Transmittal Summary fully documents compensating factors in determining the investment quality of the loan."

## V. The Countrywide Mortgage Loans Show An Abnormally High Rate of Default.

56.     After United Guaranty issued the last Insurance Policy for the transactions described above, Countrywide's Mortgage Loans began to show a high number of delinquencies.  Many of these delinquent loans resulted in defaults, causing the Trustees to submit claims on the Insurance Policies.

57.     In response, United Guaranty diligently complied with its obligations under the Insurance Policies.  As of March 2009, while reserving its rights, United Guaranty has paid hundreds of millions of dollars on the Insurance Policies.

58.     United Guaranty normally investigates each claim under an Insurance Policy before making a payment on that claim.  United Guaranty's investigation of claims under the Insurance Policies revealed an unusually high rate of fraud in the loan files, including misreported borrower income, missing documentation, and violations of underwriting guidelines.

## VI. United Guaranty's Internal Review Reveals Widespread Fraud by Countrywide.

59.     Following discovery of this high rate of fraud, United Guaranty began an internal review of the loans underlying the CWHEQ transactions.  As part of its review, United Guaranty requested and obtained loan files from Countrywide for certain

Mortgage Loans, which represented a sample of the Mortgage Loans for particular CWHEQ transactions. As described above, in the course of each transaction, Countrywide transmitted to United Guaranty a loan data tape containing some information on the loans that were to be included in the loan pool. Both during and after these transactions, Countrywide retained in its possession the loan files themselves. It is the loan files that contain the actual documents on which a loan is based.

60.     United Guaranty's review of these loan files to date has revealed that many of the Mortgage Loans failed to comply with Countrywide's underwriting standards and guidelines. For example, for many loans the borrower's debt-to-income ratio is higher than permitted under the guidelines. As another example, the guidelines may allow for exceptions when there are strong compensating factors. However, many of Countrywide's numerous exceptions have no compensating factors whatsoever. Instead, Countrywide granted exceptions where the express justification was to increase its own market share by meeting a competitor's offer. Additionally, the loan files were materially deficient in other ways, such as missing necessary documents or containing inflated property valuations.

61.     United Guaranty's review of these loan files to date has revealed that a significant proportion of the Mortgage Loans underlying the CWHEQ transactions were either materially deficient or failed to comply with Countrywide's underwriting standards and guidelines. The industry standard – and United Guaranty's standard – is that a review fails if there is a 5% finding of material defects, a 10% finding of minor defects,

or a 10% finding of both material and minor defects combined. Here 19% of the

Mortgage Loans contained material defects, and 12% contained minor defects. This rate

of material and minor defects greatly exceeds the maximum rate acceptable under both

under industry practice and United Guaranty's practice. On top of this, 17% of the

Mortgage Loans in this review failed to comply with Countrywide's own underwriting

guidelines. In short, United Guaranty's internal review to date has shown that

Countrywide Home Loans falsely represented a significant proportion of the Mortgage

Loans underlying the CWHEQ transactions so as to induce United Guaranty to issue the

Insurance Policies.

62.     The following are some specific examples of material errors and

underwriting violations found in United Guaranty's review of the loan files:

a.  Countrywide failed to report that a retiree's debt-to-income ratio fell

outside of its guidelines and did not verify his asset reserves with a

retirement statement as required. Had United Guaranty learned the true

debt to income ratio, it would not have insured the loan.

b.  Countrywide approved a loan for a borrower who had declared bankruptcy

within the last five years and the loan file did not contain any required

compensating factors or bankruptcy papers necessary for an underwriting

exception.

c. Countrywide misreported the size of a borrower's original mortgage and therefore the loan-to-value ratio was artificially low. Had United Guaranty been aware of the true LTV ratio, it would not have insured the loan.

63. In addition to misrepresenting that the loans complied with its underwriting guidelines, Countrywide also misrepresented the Mortgage Loans in the loan data tapes submitted to United Guaranty. These tapes were the only information that Countrywide transmitted to United Guaranty about the loans prior to the close of each CWHEQ transaction, because prior to the closing Countrywide retained in its possession the loan files themselves. The tapes contain the following misrepresentations about the Mortgage Loans:

a. Countrywide misrepresented borrowers' incomes and debts. The debt-to-income ratio for a borrower is one of the most important measures of that borrower's ability to repay a loan.

b. Countrywide's property appraisals materially overstated the value of the collateral underlying the loans. Because the property is the only security pledged for repayment of a loan should the borrower default, such overstatements fundamentally alter the risk of insuring that loan.

c. Countrywide misrepresented the lien position on properties. As a result, properties were encumbered by additional undisclosed mortgages.

64. Countrywide's misrepresentations are material because if United Guaranty had been aware of the true nature of the Mortgage Loans, it would not have issued the

Insurance Policies at the same rate of premium. Instead, it would have either declined to issue any insurance policy or it would have issued a different insurance policy at a much higher rate of premium.

**VII.** **Numerous Lawsuits Filed Against Countrywide Have Revealed Its Corrupt Practices.**

65. The impact of the Mozilo-Sambol plan on Countrywide has been a disaster. Countrywide's market capitalization declined by more than 90% in just one year, losing $25 billion in value. In July 2008, Bank of America acquired Countrywide Financial for just 27% of Countrywide's stated $15.3 billion book value.

66. The scope and breadth of Countrywide's fraudulent schemes and other unlawful conduct have prompted a substantial number of public and private inquiries, investigations, and actions. The actions are based, in part, upon misconduct by Countrywide that violates Countrywide's representations, warranties, and covenants in the Insurance Policies.

67. On information and belief, the Department of Justice and the SEC are investigating potential securities frauds in the securitizations of mortgage loans and offerings of mortgage-backed securities in the secondary market, as well as allegations that false and misleading disclosures were made to influence Countrywide's stock trading price and allegations of insider trading by Mozilo and Sambol.

68. A number of States and municipalities have announced investigations of Countrywide's lending practices, and several commenced actions against Countrywide, including:

i.   *People of the State of California v. Countrywide Financial Corp.*;

ii.  *People of the State of Illinois v. Countrywide Financial Corp.*;

iii. *State of Connecticut v. Countrywide Financial Corp.*;

iv.  *Office of the Attorney General for the State of Florida v. Countrywide*;

v.   *State of Washington v. Countrywide Financial Corp.*;

vi.  *State of Indiana v. Countrywide Financial Corp.*;

vii. *State of West Virginia v. Countrywide Financial Corp.*;

viii. *City of Cleveland v. Countrywide Financial Corp.*; and

ix.  *City of San Diego v. Countrywide Financial Corp.*

69.     The Department of Justice and the U.S. Trustees for federal bankruptcy courts in several judicial districts, including districts in Rhode Island, Pennsylvania, Texas, Florida, and Georgia, commenced investigations of Countrywide's alleged fraudulent foreclosure practices.  In addition, a number of private actions have been commenced against Countrywide, including shareholder actions challenging the accuracy and completeness of Countrywide's statements in and around the period between 2004 and 2007.  Finally, in *Zachary v. Countrywide Financial et al.*, a former manager of Countrywide Financial alleges he was terminated after bringing Countrywide's fraudulent activities to the attention of his superiors.

70.     On October 6, 2008, Countrywide – through Bank of America – announced a proposed multistate settlement of all pending actions by the Attorneys General,

including the Attorney General of North Carolina ("Settlement"). Instead of contesting these claims, Countrywide agreed to provide $8.4 billion to reduce payments on thousands of alleged predatory mortgage loans. The proposed terms of the Settlement provide that it would not constitute an admission of liability by Countrywide with respect to Countrywide's mortgage origination. However, Bank of America acknowledged in its announcement that, when it acquired Countrywide, it anticipated a settlement of this magnitude: "The cost of restructuring these loans is within the range of losses we estimated when we acquired Countrywide."

## VIII.  United Guaranty Has Been Substantially Damaged by Countrywide's Practice of Securitizing Its Worst Loans.

71.    Because a significant proportion of Mortgage Loans failed to comply with Countrywide's underwriting standards and guidelines or contained other material misrepresentations, the number of defaults in those Mortgage Loans has been extremely high, as those loans were made to borrowers who were unlikely to be able to repay. As a direct consequence, United Guaranty has been forced through the Insurance Policies to pay claims, resulting in millions of dollars of losses to United Guaranty. United Guaranty's losses bear no reasonable relationship to the risks that it agreed to assume. By its misrepresentations, Countrywide led United Guaranty to accept a much greater risk than it would have accepted had Countrywide truthfully represented the Mortgage Loans.

72.    As a direct result of Countrywide's material misrepresentations and breaches of contract, United Guaranty is exposed to enormous risks of payments under

the Insurance Policies for which it is not being adequately compensated. This exposure has decreased United Guaranty's revenues significantly, forced it to take substantial reserves, and caused it to suffer other losses.

73. United Guaranty now seeks to rescind the Insurance Policies in a related arbitration with the Trustees, and through this suit it seeks to recover damages on the basis of Countrywide's material misrepresentations, breaches of contract, and other misconduct.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

74. United Guaranty incorporates by reference all the foregoing allegations as though fully set forth herein.

75. This is a claim for breach of contract against Countrywide Home Loans.

76. The Commitment Letters for the nine CWHEQ securitizations are valid and enforceable contracts that give rise to certain obligations on the part of Countrywide Home Loans with respect to the Mortgage Loans.

77. United Guaranty has performed and continues to perform all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Commitment Letters.

78.     Countrywide Home Loans' express representations and warranties in the Commitment Letters, and representations and warranties incorporated by reference within the Commitment Letters, are untrue and inaccurate in material ways as of the date of each Commitment Letter.  Therefore, Countrywide Home Loans is in breach of each Commitment Letter.  In addition, Countrywide knew these representations and warranties to be untrue and inaccurate at the time it entered into the Commitment Letters.  The untrue and inaccurate representations and warranties materially and adversely affect United Guaranty's interests.

79.     Countrywide Home Loans' representations and warranties in the Commitment Letters were material to each decision by United Guaranty to issue the Insurance Policies.  United Guaranty relied on Countrywide Home Loans' express and incorporated representations and warranties, and it was induced thereby to enter into each Insurance Policy and to perform its obligations and covenants thereunder.

80.     United Guaranty has suffered damages due to Countrywide Home Loan's breaches of the Commitment Letters, including, but not limited to, paying out claims caused by the excessively high default rates within the pools of Mortgage Loans.


## SECOND CAUSE OF ACTION
## (BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING)

81.     United Guaranty incorporates by reference all the foregoing allegations as though fully set forth herein.

82.     This is a claim for breach of the implied covenant of good faith and fair dealing against Countrywide Home Loans.

83.     Countrywide has breached the implied covenant of good faith and fair dealing implicit in the Commitment Letters and the Insurance Policies for each CWHEQ.

84.     United Guaranty has performed and continues to perform all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Commitment Letters and Insurance Policies.

85.     The conditions required for Countrywide's performance under the contracts have occurred.

86.     Countrywide has unfairly interfered with United Guaranty's rights to receive the benefits of these contracts.  Countrywide affirmatively represented that the Mortgage Loans had been evaluated consistently with the underwriting standards and guidelines that led Countrywide to be an industry leader.  These representations were false and caused United Guaranty to suffer losses it would not have otherwise suffered but for the breach.

87.     Countrywide's breach has caused substantial harm and damages to United Guaranty, including, but not limited to, paying out claims caused by the excessively high default rates within the pools of Mortgage Loans.

## THIRD CAUSE OF ACTION
### (FRAUD)

88.     United Guaranty incorporates by reference all the foregoing allegations as though fully set forth herein.

89.     This is a claim for fraud against Countrywide Home Loans and Countrywide Financial.

90.     As set forth above, Countrywide has made untrue statements of material fact and has omitted to state material facts necessary in order to make the statements not misleading in light of the circumstances under which they were made.  Countrywide made these statements with knowledge of their falsity, with knowledge that facts omitted were material, and with reckless disregard as to their falsity.  Countrywide made these statements with the intent that United Guaranty rely on them, and United Guaranty did justifiably rely on them.  As a result of Countrywide's fraud, United Guaranty has suffered damages.

91.     For each CWHEQ securitization, Countrywide made the following misrepresentations to fraudulently induce United Guaranty to provide insurance coverage for the Mortgage Loans underlying the transaction:

*(a) The Loan Tapes*

92.     Countrywide, knowingly or recklessly and with intent to defraud, caused its employees and agents to submit materially false and misleading mortgage loan documentation to United Guaranty in the form of loan tapes.  These loan tapes included

material information about the Mortgage Loans for which Countrywide sought coverage, including each borrower's loan-to-value ratio, debt-to-income ratio, and FICO score. This data was materially inaccurate and incomplete. In addition, Countrywide knowingly or recklessly failed to underwrite these loans according to its own underwriting standards. As a result, the loan tapes did not accurately reflect information about the borrower or the true risk profile of the Mortgage Loan. Countrywide failed to disclose to United Guaranty that these loans were not underwritten in accordance with Countrywide's own underwriting standards. Countrywide sent United Guaranty materially false and misleading loan tapes by email for the following CWHEQ transactions: CWHEQ 2005-F, CWHEQ 2006-S1, CWHEQ 2006-A, CWHEQ 2006-B, CWHEQ 2006-C, CWHEQ 2006-D, CWHEQ 2006-E, CWHEQ 2006-F, and CWHEQ 2006-H. For each CWHEQ transaction, Countrywide sent United Guaranty a loan tape before the parties signed a Commitment Letter.

93.     Countrywide was aware that United Guaranty relied on the data contained in the loan tapes to set the price of the insurance that would cover each loan, and United Guaranty did in fact use its pricing models on this data to generate risk profiles for the Mortgage Loans and price premiums for the insurance. Countrywide's material misrepresentations and omissions caused United Guaranty to insure Mortgage Loans that it would otherwise have refused to insure and cover Mortgage Loans that it would otherwise have refused to cover. As a result, United Guaranty has suffered damages because it has paid claims for Mortgage Loans it would have refused to cover had it

known the true nature of the loans, and it has also suffered damages because it did not charge sufficient premium to cover the true risk inherent in the Mortgage Loans.

### (b) The Commitment Letters

94.     Countrywide, knowingly or recklessly and with intent to defraud, executed a Commitment Letter for each CWHEQ that contained false and misleading information. In each of these letters, Countrywide represented that: (i) the loans were underwritten in accordance with Countrywide Home Loans' underwriting guidelines; and (ii) the loans comply with certain terms and conditions of the associated Insurance Policy.

95.     Countrywide executed a Commitment Letter containing false and misleading information for each of the following CWHEQ transactions:   CWHEQ 2005-F, CWHEQ 2006-S1, CWHEQ 2006-A, CWHEQ 2006-B, CWHEQ 2006-C, CWHEQ 2006-D, CWHEQ 2006-E, CWHEQ 2006-F, and CWHEQ 2006-H.

96.     Countrywide was aware that United Guaranty would rely on the representations in each of these Commitment Letters in pricing and issuing insurance policies to cover the Mortgage Loans, and that without these representations United Guaranty would not have issued the Insurance Policies.  United Guaranty would not have engaged in the Commitment Letter and would not have insured the Mortgage Loans for each CWHEQ had it known that the representations made by Countrywide were false, including the representation that Countrywide had underwritten the Mortgage Loans according to its underwriting guidelines.  As a result of Countrywide's misrepresentations in the Commitment Letters, United Guaranty has suffered damages because it has paid

claims for loans it would have refused to cover had it been aware of the falsity of Countrywide's representations.

97.     United Guaranty also relied upon the public statements made by Countrywide, described above, that Countrywide adhered to sound underwriting practices, carefully screened borrowers based on their ability to repay loans, and enacted rigorous fraud screening procedures meant to minimize risk of default.  Countrywide's executives made these statements to the public with the expectation that market participants would rely on them in choosing to do business with Countrywide.  However, as described above, in actuality, Countrywide had systematically disregarded its underwriting practices and these public statements were in fact false.  Had United Guaranty been aware of the falsity of these statements, it would have refused to do business with Countrywide and would not have entered into any of the Insurance Policies in question.  As a result of these false statements, United Guaranty has been damaged because it has suffered losses on Insurance Policies it would have refused to issue had it known these statements to be false.

98.     Countrywide's misrepresentations of facts, and omissions of fact that caused other statements of fact to be misleading, related to contemporaneous matters and to the state of affairs as of and then existing at the time United Guaranty was induced to enter into the Insurance Policies.

99.     Countrywide's misrepresentations of facts, and omissions of fact that caused other statements of fact to be misleading, relate to its own acts and omissions, and

it was only by making such representations that Countrywide was able to obtain

mortgage insurance from United Guaranty for the Securitizations.

100.    Countrywide knew at the time it entered into each Commitment Letter that

the above statements were false or, at the very least, made recklessly, without any belief

in the truth of the statements.

101.    Countrywide intended to defraud United Guaranty and induce reliance by

United Guaranty in this regard, as Countrywide sought to securitize the Mortgage Loans

and transfer the risk of such loans to other parties, including (as described above) United

Guaranty.  Countrywide knew that the securities issued by the trusts would be rated

higher by rating agencies and would be more attractive to investors, and therefore would

likely be sold at a higher price and/or lower cost to Countrywide, if United Guaranty

agreed to insure the Mortgage Loans.

102.    United Guaranty justifiably, reasonably, and foreseeably relied on all the

above representations and false statements.  Countrywide knew that United Guaranty was

relying on Countrywide's expertise, and Countrywide encouraged such reliance.

Countrywide knew that its representations described above would be relied upon by

United Guaranty in connection with its decision to issue each insurance policy.  Based on

its expertise and specialized knowledge, and in light of its false and misleading

representations, Countrywide owed a duty to United Guaranty to disclose material facts

about the Securitizations.

103.     Countrywide's representations substantially influenced United Guaranty's decision to issue a policy for the Mortgage Loans included in each CWHEQ.  United Guaranty would never have agreed to provide any of the Policies had it known that Countrywide's representations about the Mortgage Loans were false and that Countrywide had omitted material information.

104.     As a result of Countrywide's false and misleading statements and omissions as alleged herein, United Guaranty has suffered, and is reasonably certain to continue suffering, damages, including, but not limited to, paying out claims on the Insurance Policies caused by the excessively high default rates within the pools of Mortgage Loans.

105.     Because Countrywide committed these acts and omissions maliciously, wantonly, and oppressively, and because the consequences of Countrywide's acts knowingly affected the general public, including, but not limited to, all persons with interests in the Securitizations, United Guaranty is entitled to recover punitive damages.

## FOURTH CAUSE OF ACTION
### (NEGLIGENT MISREPRESENTATION)

106.     United Guaranty incorporates by reference all the foregoing allegations as if fully set forth herein.

107.     This is a claim for negligent misrepresentation against Countrywide Home Loans and Countrywide Financial.

108.    Countrywide represented that the Mortgage Loans underlying each CWHEQ were underwritten according to Countrywide's underwriting guidelines, and in accordance with prudent underwriting judgment.

109.    These representations were materially false and misleading, and Countrywide had no reasonable grounds for believing this information to be true.

110.    Countrywide's specific misrepresentations are described above.

111.    Countrywide intended for United Guaranty to rely on these representations in making the decisions to issue Insurance Policies to cover the Mortgage Loans, and United Guaranty did justifiably rely on these representations in making the decision to issue Insurance Policies to cover the Mortgage Loans.  United Guaranty was unaware of the falsity of these representations when they were made.

112.    As a result of these misrepresentations, United Guaranty has suffered and continues to suffer damages, including, but not limited to, paying out claims caused by the excessively high default rates within the pools of Mortgage Loans.

## FIFTH CAUSE OF ACTION
### (NEGLIGENCE)

113.    United Guaranty incorporates by reference all the foregoing allegations as if fully set forth herein.

114.    This is a claim for negligence against Countrywide Home Loans and Countrywide Financial.

115. Countrywide applied to United Guaranty for insurance coverage on behalf of the Trustees for the Mortgage Loans underlying the CWHEQ securitizations. Countrywide had a duty to exercise reasonable care in applying for insurance coverage, which included disclosing material information for the purpose of obtaining insurance coverage in an honest, truthful, and accurate manner and fully divulging in good faith to United Guaranty all facts within its knowledge material to insurance coverage.

116. Countrywide breached its duty in preparing insurance applications for mortgage loans underlying the following CWHEQ transactions: CWHEQ 2005-F, CWHEQ 2006-S1, CWHEQ 2006-A, CWHEQ 2006-B, CWHEQ 2006-C, CWHEQ 2006-D, CWHEQ 2006-E, CWHEQ 2006-F, and CWHEQ 2006-H.

117. As a result of Countrywide's negligence, United Guaranty has suffered and continues to suffer damages, including, but not limited to, paying out claims caused by the excessively high default rates within the pools of Mortgage Loans.

## SIXTH CAUSE OF ACTION
### (UNFAIR AND DECEPTIVE PRACTICES UNDER N.C. GEN. STAT. § 75-1.1)

118. United Guaranty incorporates by reference all the foregoing allegations as if fully set forth herein.

119. This is a claim against Countrywide Home Loans and Countrywide Financial for unfair and deceptive practices under N.C. Gen. Stat. § 75-1.1. The

Commitment Letters contain choice of law clauses providing that North Carolina law applies.

120.    By reason of the foregoing, Countrywide has been and is engaged in unfair and deceptive trade practices in or affecting commerce, in violation of N.C. Gen. Stat. § 75-1.1.

121.    United Guaranty has suffered injury in fact and has suffered monetary damage, among other things, due to Countrywide's unfair and deceptive trade practices.

122.    As a result of Countrywide's unfair and deceptive trade practices, United Guaranty is entitled to recover such damages and a trebling thereof pursuant to N.C. Gen. Stat. §75-16.


## PRAYER FOR RELIEF

WHEREFORE United Guaranty prays for relief as follows:

a.    United Guaranty's payments on current and future claims under the Policies, including draw downs on guarantees;

b.    United Guaranty's losses, including lost profits and opportunities;

c.    Indemnification for United Guaranty's attorneys' fees and costs associated with enforcing its legal rights under the Commitment Letters and Insurance Policies;

d.    A trebling of its damages and its attorneys' fees pursuant to Chapter 75 of the North Carolina General Statutes;

e.    Punitive damages;

f.      Prejudgment interest at the maximum legal rate; and

g.      Such other and further relief as the Court may deem just and proper.

DATED:  March 20, 2009          BROOKS, PIERCE, McLENDON,
                            HUMPHREY, & LEONARD, LLP


By /s/ James T. Williams, Jr.
    James T. Williams, Jr.
    Phone: (336) 271-3107
    jwilliams@brookspierce.com
    North Carolina State Bar # 4758
    Robert A. Singer
    Phone: (336) 271-3123
    rsinger@brookspierce.com
    North Carolina State Bar # 8979

    Suite 2000 Renaissance Plaza
    230 North Elm Street (27401)
    Post Office Box 26000
    Greensboro, NC 27420-6000
    Telephone:     336/271-3107
    Facsimile:     336/232-9107


Attorneys for Plaintiff

OF COUNSEL:

Philippe Z. Selendy
David Elsberg
Neil G. Cave
Peter N. Tsapatsaris
QUINN EMANUEL URQUHART
OLIVER &HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000